**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON**

**MICHAEL HARDY,**

      **Movant,**

**v.**                         **Case No. 2:13-cv-07419**
                                      **Case No. 2:10-cr-00048-02**

**UNITED STATES OF AMERICA,**

      **Respondent.**

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court is the movant Michael Hardy's (hereinafter "the defendant") Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 (ECF No. 178), his Motion for Judgment (ECF No. 220) and his Letter-Form Motion to Amend (ECF No. 229). This matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

## PROCEDURAL HISTORY

On December 2, 2009, detectives with the Metropolitan Drug Enforcement Network Team ("MDENT") utilized a confidential informant ("CI"), Jeff Witt ("Witt" or sometimes "Jeff") to arrange a controlled purchase of cocaine base from the defendant. (ECF No. 185, Ex. 2, Trial Tr., at 5-6). Witt placed a recorded phone call to the number he had for the defendant and arranged to meet him at the Hardee's restaurant on Bigley

Avenue in Charleston, Kanawha County, West Virginia, to purchase an ounce of cocaine base for $1,200.00.  (*Id.* at 8).

When Witt arrived at the Hardee's, he went into the bathroom for a few minutes before returning to the parking lot, where he met with co-defendant Pedro Munos, an associate of the defendant, from whom Witt had previously purchased drugs.  (*Id.*)  Witt and Munos then proceeded back into the Hardee's bathroom and completed the cocaine base purchase.  (*Id.*)  Test results from the West Virginia State Police Crime Lab indicated the substance obtained from Munos tested positive for cocaine base with a weight of 22.1 grams.  (*Id.* at 115-116).

On December 9, 2009, MDENT detectives again used Witt as a CI to arrange another controlled purchase of cocaine base from the defendant.  Witt's wife was present in his car at the time of this purchase.  (*Id.* at 11).  Again, Witt called the defendant and arranged to purchase one ounce of cocaine base for $1,200.00.  This controlled buy was also set to take place at the Hardee's on Bigley Avenue; however, once Witt arrived there, he received an unrecorded phone call from the defendant who changed the location to a 7-11 store on West Washington Street in Charleston, Kanawha County, West Virginia.  (*Id.* at 41).  During this time, the defendant was observed in a neutral colored Chevrolet Tahoe on West Washington Street and again on Somerset Drive, which is a route that leads to the defendant's home on Amity Drive on the west side of Charleston.  (*Id.* at 13-14, 87).

Approximately 10 minutes after Witt arrived at the 7-11, Pedro Munos arrived in the defendant's Tahoe.  (*Id.* at 15).  Witt entered the Tahoe and completed the drug deal with Munos.  Witt then returned to his vehicle and left the area to give the drugs to the MDENT officers.  (*Id.* at 42-43).  Munos was then arrested as he exited the 7-11.  (*Id.* at

43).  Testing on the substance obtained during this second controlled purchase indicated that it was cocaine base which weighed 20.4 grams.  (*Id.* at 116).

On December 9, 2009, following the second controlled purchase, several MDENT officers, as well as Special Agent Bob Negro of the federal Drug Enforcement Administration ("DEA") proceeded to the defendant's house on Amity Drive to conduct a "knock and talk."  (*Id.* at 98).  Special Agent Negro called the defendant who agreed to come outside to speak to the officers. (*Id.* at 74).  The officers informed the defendant that they had information that he was involved in the selling of crack cocaine and asked if he would consent to a search of his home.  The defendant gave written consent for the search.  (*Id.* at 74).  During the search, officers found three sets of digital scales and approximately $3,400.00 in United States currency.  (*Id.* at 88, 94-96).  An officer also found of 0.72 grams of crack cocaine in a bathroom sink in the basement of the home.  (*Id.* at 102, 116).

After being advised of and waiving his *Miranda* rights, the defendant gave a recorded statement to Special Agent Negro in which he admitted that he received a phone call from "Jeff" that day looking for crack cocaine.  During the statement, the defendant allegedly stated that Munos (who also went by the name "Pablo") was at his house at the time "Jeff" called and he told "Pablo" that "Jeff" wanted to buy some crack cocaine and "Pablo" went and took care of it.  (*Id.* at 76 and Tr. Ex. 6). [1]

On May 11, 2010, a federal grand jury returned a two count Superseding Indictment charging the defendant and Pedro Munos with two counts of aiding and

---

[1] Three clips from the recorded statement were admitted as Government Exhibit 6 and played for the jury. There is a gap in the recording at a point where the defendant was responding to what he told "Jeff" when he called on December 9, 2009. Special Agent Negro testified that there was a malfunction of the recording equipment and that a portion of the defendant's statement was not recorded.  Special Agent Negro represented to the jury that the defendant denied having any involvement in the deal, but admitted to being a "middleman" by telling "Pablo" that "Jeff" was looking for some crack and then "Pablo" "took care of his thing."  (ECF No. 171 at 82).

abetting the distribution of five grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, arising out of the two controlled purchases on December 2, 2009 and December 9, 2009.  (ECF No. 25).  Munos pled guilty (ECF No. 50), pursuant to a written plea agreement (ECF No. 51) to Count One of the Superseding Indictment, which alleged aiding and abetting the distribution of cocaine base on December 2, 2009. On November 9-10, 2010, a jury trial was held concerning the charges against the defendant.  At trial, the defendant was represented by Joshua P. Sturm.[2]

At trial, the United States presented the testimony of Jeff Witt, Pedro Munos and Detective Tom Carper concerning the controlled purchases on December 2 and December 9, 2009.  Through Witt's testimony, the United States also introduced a recording which allegedly captured the telephone call between the defendant and Witt on December 2, 2009 to arrange for the controlled purchase of one ounce of cocaine for $1,200.00 at the Hardee's.  The United States also introduced the defendant's recorded statement given to Special Agent Negro.  Additionally, Lieutenant Chad Napier, Detective David Richardson, and Detective Derrick McDaniel testified concerning the items recovered during the search of the defendant's house.  Forensic Chemist Nicole MacEwan testified about the test results on the cocaine base, and DEA Special Agent Barry Parsons testified as an expert witness in the area of drug investigations.  (*Id.* at 118-130).

The defendant did not testify and the defense presented no other evidence.  (*Id.* at 134).  The defendant's motions for judgment of acquittal were denied.  (*Id.* at 132-133,

---

[2] The defendant had previously been represented by two other attorneys, Nathan A. Hicks, Jr. and Edward Weis, both of whom had to withdraw as counsel due to conflicts of interest.  Mr. Sturm was appointed to represent the defendant on or about July 27, 2010 (*nunc pro tunc* to July 23, 2010), approximately three and half months before trial.  (ECF No. 66).

135).   The jury convicted the defendant of both counts of aiding and abetting as pled in the Superseding Indictment.  (*Id.* at 150; ECF No. 114).

On February 22, 2011, Mr. Sturm was relieved as counsel for the defendant (ECF No. 139) and, on March 9, 2011, Herbert L. Hively II was appointed to represent the defendant (ECF No.140).  A sentencing hearing was held on October 20, 2011.  The defendant was also before the court for a revocation hearing on violations of a prior term of supervised release.  The first alleged violation in the revocation petition was based upon the substantive charges in Count One of the Superseding Indictment upon which the defendant was convicted.

Judge Johnston first addressed the allegations in the revocation petition.  The defendant admitted to the violations of his term of supervised release, including violation number one, which was based upon the controlled buy on December 2, 2009.  (ECF No. 172 at 3-7).  The defendant was sentenced to a consecutive term of 24 months in prison for the violations of his term of supervised release.  (Case No. 2:04-cr-00003, ECF No. 89).  The defendant was sentenced to 144 months in prison, followed by a six-year term of supervised release, on his new convictions.  A Judgment to that effect was entered on November 7, 2011.  (Case No. 2:10-cr-00048-02, ECF No. 156).[3]

### *The defendant's direct appeal*

On November 8, 2011, the defendant filed a timely Notice of Appeal.  (ECF No. 158).  On or about April 9, 2012, the defendant, by counsel, filed an appellate brief

---

[3] On October 28, 2015, Judge Johnston granted the defendant's Motion for Modification of Sentence under 18 U.S.C. § 3582(c), and reduced the defendant's term of imprisonment in Case No. 2:10-cr-00048-02 from 144 months to 100 months, based upon the retroactive amendment of the United States Sentencing Guidelines concerning crack cocaine offenses.  As explained in Judge Johnston's Memorandum Opinion and Order entered on January 14, 2016 (ECF No. 241), this reduction had no effect on the defendant's 24-month consecutive sentence for his supervised release revocation.

asserting that the evidence was insufficient to support the verdict and that his counsel was ineffective.  On August 21, 2012, the defendant filed a *pro se* supplemental brief in which he alleged prosecutorial misconduct via the misrepresentation of key evidence and the alleged constructive amendment or variance of the indictment, the effective denial of material discovery evidence, and the ineffective assistance of his trial counsel.  (ECF No. 244, Attach. 1, supplementing Ex. 1 to ECF No. 185).

The Fourth Circuit granted the defendant's motion to file this *pro se* brief, but ultimately found no reversible error based upon the claims raised therein.  *See United States v. Hardy*, No. 11-5171, 498 F. App'x 191 (Oct. 15, 2012).  Thus, the Fourth Circuit affirmed the defendant's convictions; however, the Court declined to address the defendant's claims of ineffective assistance of counsel, finding that any alleged ineffectiveness was not conclusively established by the record and would be better addressed on collateral review.  *Id.* at 192.  The defendant did not file a Petition for a Writ of Certiorari in the United States Supreme Court.

### *The defendant's section 2255 motion*

On April 8, 2013, the defendant filed his initial Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 (hereinafter "section 2255 motion").  (ECF No. 178).  In his section 2255 motion, the defendant re-asserts the arguments made in his direct appeal, including those raised in his *pro se* brief.  Specifically, the defendant asserts that the prosecution engaged in misconduct by playing a recording of a telephone call between the defendant and CI Witt to arrange for a purchase of crack cocaine on November 20, 2009, which was never completed, and represented to the jury that such recording was of a telephone call between the defendant and CI Witt on December 2, 2009.  The section 2255 motion states:

6

> Simply stated, prosecutor McVey took an audio recording from the late Nov. telephone call and represented to the court and jury that it was [D]ec. 2. 2009 call between me and the [CI], [having] me setting up the deal.  The testimony from [CI] Witt was incorrect that this took place on Dec. 2, as well as was false.  Also the [CI] testified that the transaction was set for 1200.00 dollars during [Witt's] examination.  The audio was suppose[d] to take place [D]ec. 2., 09 was admitted into evidence and played. (exhibit 4).  [P]ros. McVey stopped playing the audio in court right at the point where if it would've continued the evidence would've shown a transaction for a half ounce of crack cocaine for 700.00 hund and not 1200.00 that was presented by the government, and [CI] [Witt] as well (record transcript p. 171 L 7-15) and continued throughout the whole entire trial, which is not only pros misconduct, but a constructive amendment to the indictment U.S. vs. Randell, 171 [F.3d] 195, 1499 [sic] when the government's presentation of evidence or arguments or through instructions to jury or court broadens the basis for conviction beyond those charged in the indictment also known as a fatal variance U.S. v. Redd, 161 [F.3d] 793, 795 (4th Circuit 1988) and the elements of the charge that [I] was actually convicted by jury the 700.00 dollar sell [supposedly] deal that never [occurred] U.S. vs Schrabel 939 [F.2d] 197, 203 4th Circuit 1991 it violates my 5th amendment right to be indicted by grand jury, and must be corrected on appeal even when the defendant didn't [pursue] the issue by objection . . . .

(ECF No. 178 at 3-4).  Thus, the defendant essentially argues that the government fabricated the evidence against him concerning the December 2, 2009 controlled purchase.

The defendant's section 2255 motion further contends that the government's late disclosure of discovery, particularly the audio tapes of the alleged late November 2009 attempted transaction, affected the fairness of his trial and resulted in his counsel being ill-prepared to present a proper defense.  The defendant construes this supposedly late-disclosed material as "*Brady/Jenks*" material (because he believes it to be exculpatory and/or impeachment evidence) and further contends that this resulted in an expansion of the indictment and his conviction "for a crime he wasn't a part of."  (*Id.* at 5-6).

The defendant's section 2255 motion further asserts that this alleged prosecutorial misconduct prevented him from introducing alibi witnesses to demonstrate that the

defendant could not have participated in the December 2, 2009 phone conversation with Witt. (*Id.* at 6). The defendant further questions the recording of his statement given to Special Agent Negro, stating that the equipment allegedly malfunctioned right at the point of his allegedly incriminating statement, and "magically" began working again right after it. The defendant also asserts that he had pay stubs that would demonstrate the "legitimacy" of the money that was seized from his home during the search, which was not money from either of the controlled purchases of December 2 and December 9, 2009. (*Id.* at 6-7).

Concerning his claims of ineffective assistance of counsel, the defendant contends that the first time he met his trial counsel, Mr. Sturm, who was appointed to the case on July 27, 2010 (three-and-a-half months before trial), was on October 6, 2010 at a pre-trial motions hearing. The defendant further contends that he did not see Mr. Sturm again until November 4, 2010 (five days before trial), when he dropped off some discovery materials at the jail, and promised to meet with the defendant the following day to map out their strategy. The defendant further contends, however, that Mr. Sturm failed to meet with him again and the next time he saw him was on the first day of trial. At the defendant's request, on the first morning of trial, Mr. Sturm moved for a continuance, stating that the defendant believed that they were not fully prepared; however, Judge Johnston denied a continuance, stating that the defense had several months to prepare for trial. In his section 2255 motion, the defendant now specifically contends that, due to Mr. Sturm's lack of preparation, the defense was unable to impeach the government's witnesses with inconsistencies in their statements or to call any witnesses in its own case in chief. (*Id.* at 8-10).

### *The government's response*

On April 29, 2014, the undersigned ordered the United States to file a response to the defendant's section 2255 motion.  (ECF No. 182).  On May 23, 2014, the United States filed its Response.  (ECF No. 185).  The Response asserts that the defendant's claims of prosecutorial misconduct, constructive amendment of the indictment and late or non-disclosure of alleged *Brady* material are barred from collateral review in this section 2255 proceeding because those claims were adjudicated by the appellate court in his direct appeal.  (*Id.* at 7-8).[4]  The government's brief further asserts that, to the extent that any of those claims in their present form were omitted from the appellate briefs, they are also conclusively waived and procedurally barred by the failure to present them on appeal.  The undersigned will address these assertions in greater detail *infra.*

The government further asserts that the defendant cannot demonstrate that his trial counsel's conduct fell below an objective standard of reasonableness or that he was unduly prejudiced thereby.  Specifically, the Response states:

> In this case, the defendant asserts that his counsel failed to impeach the CI's testimony or point out inaccuracies in his testimony.   Defendant's accusations are wholly unsupported by the record and the record fails to show that his lawyer's performance was objectively unreasonable or that any deficiency in his performance was prejudicial.

(*Id.* at 11).  The undersigned will discuss this argument in greater detail *infra*.

---

[4] The government's brief further asserts that the audio recordings of the November 20, 2009 and December 2, 2009 recorded telephone calls were turned over in discovery on June 4, 2010 (four months before trial) and transcripts of those calls were turned over on October 19, 2010.  (ECF No. 185 at 7-8 n.1 and Ex. 5, Discovery Responses).  Such disclosures are confirmed by the docket sheet.  (*See* ECF Nos. 44 and 94).  The government further asserts that the December 2, 2009 recorded telephone call was authenticated by Witt and admitted without objection.  The government denies that the recording was altered in any way.  (ECF No. 185 at 7-8 n.1).  Thus, the government asserts that these claims lack merit.  (*Id.*)

*The defendant's first "Judicial Notice" document (ECF No. 186)*

On May 27, 2014, Judge Johnston received a letter from the defendant inquiring about the court's receipt of a document where the defendant was asking the court to take Judicial Notice, under Rule 201 of the Federal Rules of Evidence, of a criminal complaint the defendant had allegedly filed against the United States Attorneys and other officers involved in his criminal case (Case No. 2:10-cr-00048-02).[5]  (ECF No. 186).  Rule 201 of the Federal Rules of Evidence provides in pertinent part that a federal court may take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned. Fed. R. Evid. 201(b).   The defendant has not provided this court with evidence that accurately demonstrates when, where, how and against whom this alleged criminal complaint was filed, or evidence that identifies the allegations potentially included in the alleged "criminal complaint."  Accordingly, pursuant to Rule 201 of the Federal Rules of Evidence,

---

[5]  The defendant's letter contends that his "Judicial Notice" document concerning the filing of this alleged criminal complaint was received in the Clerk's Office of this court on April 14, 2014, as evidenced by the signature on a certified mail return receipt signed by Deputy Clerk Lisa A. Dent, for certified mail addressed to Judge Johnston.  (ECF No. 186, Ex. 1).  Exhibit 2 to ECF No. 186 is a document entitled "Judicial Notice" in which it appears that the defendant is asking the court to take judicial notice of the fact that he had pursued a "criminal complaint" asserting that the prosecutors and law enforcement agents involved in this case had engaged in: "(1) perjury in violation of 18 U.S.C. § 1623; (2) conspiracy to knowingly, unlawfully and intentionally file fraudulent documents in federal court; (3) malfeasance of officer breach of Fiduciary Duty to uphold Article VI of the United States Constitution; (4) Deprivation of Rights for violation of Amend. V, Due Process to be indict[ed] by Grand Jury on charges that Petitioner can defend."  (ECF No. 186, Ex. 2).  The "Judicial Notice" document further states that "[t]he criminal complaint is applicable to 2255" and lists three incomplete case citations.  (*Id.*)

A federal court cannot initiate criminal charges or investigations.   That is the responsibility of the Department of Justice under the leadership of the United States Attorney General and the United States Attorneys under his or her charge.   Accordingly, if the defendant wished to seek an investigation and prosecution of the charges levied in his "Judicial Notice" document, he needed to pursue such relief through whatever channels are available through the Department of Justice, not this federal court.  The defendant's Reply brief appears to clarify that he did pursue his "criminal complaint" with the United States Attorney General.  (ECF No. 187 at 10, 20).  However, he has failed to provide this court with any evidence of such filing or the current status of that alleged complaint.

the undersigned proposes that the presiding District Judge **FIND** that the defendant's "Judicial Notice" document (ECF No. 186) does not contain facts that "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned" and, thus, the court may not appropriately take judicial notice thereof.  Consequently, it is respectfully **RECOMMENDED** that the presiding District Judge **DECLINE** to take judicial notice as requested by the defendant.[6]

### *The defendant's Reply brief*

On July 9, 2014, the defendant filed a Reply (ECF No. 187).  The Reply continues to focus on the defendant's claim of prosecutorial misconduct, and the government's assertion that the defendant's claims, other than his ineffective assistance of counsel claim, are either barred as having been previously raised in his appeal or waived and/or procedurally barred because they were not raised in his direct appeal.

The defendant argues that he has "diligently" attempted to pursue relief on all of his claims through the "proper channels."  (*Id.* at 2-4).  The Reply reiterates the defendant's assertions that the government engaged in a "bait and switch technique" through "fraudulent misrepresentations" of evidence to the jury of an alleged drug transaction that never came to fruition and represented it as one of the controlled buys that formed the basis of the Superseding Indictment, with which the defendant denies any involvement.  (*Id.* at 5-6).  The defendant then contends that he:

> attempted to work with the appellate counsel to remedy such and bring it to the Appellate court's attention to no avail.  Thereafter, Petitioner attempted to alert the Appellate Court of the mis-dealings, and was in fact granted an opportunity to present such. * * * Thereafter, he prepared to the best of his ability the claims and positions related thereto and submitted such to the

---

[6]  As addressed further *infra*, the undersigned believes that the defendant is procedurally barred from pursuing his prosecutorial misconduct claim in this section 2255 proceeding.  Accordingly, the evidence of the filing of a "criminal complaint" related to this alleged prosecutorial misconduct appears to be irrelevant to the actionable claims in the instant proceeding.

> Appellate Court but was subsequently denied relief as he failed to support
> such with any authorities.  This prosecution for the deprivation of his rights
> guaranteed under the Constitution of the United States followed.

(*Id.* at 7-8).

Thus, the defendant's Reply admits that he unsuccessfully raised these issues on appeal.  Nevertheless, the majority of his Reply continues to focus on his prosecutorial misconduct claim and his assertion that there is insufficient evidence to demonstrate that he is guilty of aiding and abetting the two controlled buys that formed the basis of the Superseding Indictment.  (*Id.* at 5-8, 16-17).  The defendant repeatedly maintains that he is "actually innocent" of aiding and abetting those transactions as presented by the government at trial.  (*Id.* at 17-18).  He claims that, "[h]ad the jury been apprised of the evidence 'properly' as Due Process and a Fair Trial warrant and that other than 'unfounded testimony' there was nothing to link petitioner to the '1,200 deal' petitioner would not have been found guilty."  (*Id.* at 18).

The defendant's Reply further asserts that he was denied due process of law because he was subjected to a mandatory minimum sentence of five years under 21 U.S.C. § 841(b)(1)(B) based upon the evidence presented by the government.  The defendant again contends that the recording of the incomplete November 20, 2009 controlled buy, which allegedly involved the sale of a half-ounce (14 grams) of cocaine base, was played for the jury and represented by the prosecution as the December 2, 2009 controlled buy for one ounce (28 grams) of cocaine base.

The defendant further contends for the first time that his case fell into the "pipeline" of cases where defendants should not have received a mandatory minimum sentence because, even though his offense conduct occurred prior thereto, he was sentenced after the enactment of the Fair Sentencing Act of 2010 ("FSA"), which reduced

the crack to powder cocaine ratio from 100:1 to 18:1. (ECF No. 187 at 14-15).[7]  The

defendant cites *Dorsey v. United States*, 567 U.S. ____, 132 S. Ct. 2321, 183 L. Ed.2d 25

(2012) in support of this contention.  (*Id.* at 14).[8]

Turning to his claims of ineffective assistance of counsel, the defendant's Reply

reiterates his assertion that Mr. Sturm was insufficiently prepared to defend his case, and

the Reply attempts to bootstrap his prosecutorial misconduct allegations to his ineffective

assistance of counsel claim. The Reply states:

> Had this attorney not [sic] only prepared for trial [and] consulted with the
> petitioner about the essential elements of the case and the evidence related
> thereto, he would have seen and been prepared to make an "adequate
> defense" to the "fraudulent evidence" submitted to the jury and relied upon
> to make its determinations of guilt that resulted in petitioner's 144 month
> sentence.  As to such lack of preparation he was unable to defend against
> fraud, perjury, trickery, obstruction of justice, falsification of evidence, etc.
> As a result, petitioner being "untrained in the law" was prejudiced in the
> highest and this court should order an evidentiary hearing to determine
> such. [Citation omitted].

(ECF No. 187 at 19-20).

### *The defendant's Motion for Hearing and Motion for Judgment*

On May 15, 2015, the defendant filed a Motion to Schedule Hearing within 14 Days

(ECF No. 219) and a Motion for Judgment (ECF No. 220), both seeking an expeditious

---

[7]  Prior to the FSA, the distribution of more than <u>five</u> grams of cocaine base (which is what the defendant's Superseding Indictment charged him with aiding and abetting) subjected a defendant to a mandatory minimum sentence of five years and a maximum of 40 years.  After the FSA, the trigger for the five-year mandatory minimum sentence was a transaction involving more than 28 grams of cocaine base.

[8]  Claims raised for the first time in a reply are generally not reviewable.  *See, e.g., Carter v. Lee*, 283 F.3d 240, 252 n.11 (4th Cir. 2002) ("this Court normally views contentions not raised in an opening brief to be waived); *Cutera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint but rather is raised only in response to a motion for summary judgment is not properly before the court.").  Nevertheless, even if this claim were reviewable in the present procedural posture, it appears that it lacks merit because, during the sentencing hearing, Judge Johnston took into account the effect of the FSA, and the defendant was not sentenced to a mandatory minimum sentence. (ECF No. 172 at 15).  Moreover, it further appears that this claim is mooted by the sentence reduction granted by Judge Johnston on October 28, 2015.  (ECF No. 233).  Accordingly, the undersigned will not further address this claim.

ruling on his section 2255 motion.  In light of the evidentiary hearing conducted in this matter on June 16, 2016, by separate Order, the undersigned has denied as moot the defendant's Motion to Schedule Hearing within 14 Days (ECF No. 219).  The Motion for Judgment (ECF No. 220) will be addressed herein.

<u>*The defendant's Motion to Amend and other Judicial Notice documents*</u>

On July 13, 2015, more than two years after he filed his initial section 2255 motion, the defendant filed a Letter-Form Motion to Amend or Correct Judgment (ECF No. 229), in which he seeks to pursue a claim asserting that his criminal history category under the United States Sentencing Guidelines was improperly calculated.  Specifically, the defendant contends that he should have been placed in a Criminal History Category V, instead of VI, because two of his prior convictions were for misdemeanor charges "that ran together and [were] sentenced on the same day."  Thus, he contends that he should have received one criminal history point, rather than two, for those offenses.  The defendant cites Amendment 709 to the United States Sentencing Guidelines, which took effect in 2007 (prior to his conviction and sentencing).[9]  The defendant also made this argument in "Additional Documentation" docketed in ECF No. 221 on May 5, 2015, and in documents he entitled "Judicial Notice" contained in ECF Nos. 235[10] and 237, both of

---

[9]   Amendment 709 provided that any prior sentences resulting from offenses contained in the same charging instrument or imposed on the same day should be counted as a single sentence for the purpose of calculating a defendant's criminal history category.  *See* U.S. Sentencing Guidelines Manual § 4A1.2(a)(2).

[10]  The "Judicial Notice" document contained in ECF No. 235 also addresses, for the first time, an assertion that Detective Tom Carper committed "fraud" when he testified about the money seized from the defendant's residence on December 9, 2009.  The defendant contends that Carper's testimony as to the specific denominations of currency seized from the residence "was solicited to support the Defendant's culpability to sell illegal drugs and as evidence of the proceeds from the sales of drugs" and "led [the Court, jury and Defense] to believe the Government had possession of this money."  (ECF No. 235 at 2).

On June 1, 2015, the defendant filed a Motion for Return of Property (ECF No. 223) in his criminal action, seeking the return of the currency seized from his residence on December 9, 2009, claiming that it "was not in any way connected to the indicted offense."  The United States responded to this motion, stating that the Circuit Court of Kanawha County had entered an order disposing of the property via a civil forfeiture

which were docketed on November 12, 2015.  The undersigned construes the Letter-Form Motion as a Motion for Leave to Amend his section 2255 motion to add this claim. Because this claim is untimely, procedurally barred and without merit (as discussed *infra*), the United States has not been required to respond to the motion to amend or on the merits of this claim.

### *Evidentiary Hearing conducted on June 16, 2016*

The undersigned determined that an evidentiary hearing would assist the court in the resolution of the defendant's ineffective assistance of counsel claims.  Accordingly, counsel, John A. Carr, was appointed to represent the defendant and an evidentiary hearing was held on June 16, 2016.  During the hearing, the defendant and his former counsel, Joshua P. Sturm testified.

Prior to any testimony, the undersigned requested that Mr. Carr summarize the defendant's claims of ineffective assistance of counsel.  Mr. Carr stated that there were six specific bases for the defendant's claims of ineffective assistance of counsel, which he categorized as follows:

1.      Pre-trial communications between Mr. Hardy and Mr. Sturm;

2.      The number of visits that Mr. Sturm had with Mr. Hardy;

3.      The time period in which the discovery was provided to Mr. Hardy;

4.      The lack of having reviewed the discovery with Mr. Hardy;

---

proceeding.  (ECF No. 230, Attach. 1).  Based upon this fact, the "Judicial Notice" document appears to be requesting "immediate dismissal" of the defendant's jury verdict and requests that the court take judicial notice of this alleged "fraud."   MDENT is a joint state and federal task force, and it appears that the prosecution elected to proceed with forfeiture proceedings concerning the seized currency in state court. While this District Court may take judicial notice of the fact that the Circuit Court of Kanawha County ordered the currency forfeited to the State of West Virginia on March 31, 2010, whether or not that was appropriate and whether Detective Carper's testimony was "fraudulent" are not matters of which this court can take judicial notice.

5.  Not preparing to call witnesses that Mr. Hardy had identified as being able to establish an alibi; and

6.  The failure to properly cross-examine government witnesses during trial with respect to the confidential informant's identification of Mr. Hardy and to the validity of the alleged controlled buys, *i.e.* the telephone calls.

(ECF No. 259 at 4).

During the evidentiary hearing, the defendant testified that he was notified by letter that Mr. Sturm had been appointed to represent him, but he claims that he did not see Mr. Sturm until a suppression hearing, which he believed occurred sometime in October of 2010. (ECF No. 259 at 10). The defendant claimed that Mr. Sturm told him that he did not have his file at that time. (*Id.*)

The defendant further testified that the next time he saw Mr. Sturm was at the jail a few days (he estimated three to four days) before trial when Sturm brought him some discovery and told him he would be back over the weekend to go over the discovery. (*Id.*) The defendant testified that this meeting lasted approximately 30 minutes to an hour. (*Id.* at 14). The defendant further testified that Mr. Sturm did not return to the jail and the next time he saw him was the morning that his trial began. (*Id.* at 10-11). The defendant asserts that he and Mr. Sturm never reviewed the discovery and, in particular, he had not heard the audio recordings until the government introduced them at trial. (*Id.* at 16).

The defendant further testified that there were at least three witnesses that he requested that Mr. Sturm call to support an alibi defense. Although the defendant identified Pam Woods, Cassandra Woods and Pedro Munos's fiancé (whose name he could not remember), he did not identify any specific facts about which those witnesses would have testified to support an alibi defense; nor did he offer their testimony or sworn

statements at the evidentiary hearing.  He simply stated that they would testify about "[t]he whereabouts and my innocence of the whole case." (*Id.* at 12).

The defendant also stated that, during trial, Mr. Sturm failed to introduce evidence of pay stubs which the defendant contends would have demonstrated "the amount of my money that supposedly the court had, but I found out later on that they didn't have possession of the money, that it was used in the trial" and that the money seized from his apartment came from a legitimate source and were not drug proceeds.  (*Id.*)   However, the defendant did not introduce the pay stubs as evidence or further discuss the same at the evidentiary hearing.

The defendant testified that, due to his belief that they were not prepared for trial, he requested that Mr. Sturm move for a continuance.  However, as reflected in the trial transcript, the motion for a continuance was denied.  (*Id.* at 13-14; ECF No. 167 at 12-15). The defendant further asserts that he and Mr. Sturm were only able to meet for about 10-15 minutes prior to jury selection, while the Marshals got him street clothes to wear at trial.  (ECF No. 259 at 14).

When asked by Mr. Carr what the defendant wanted to go over with Mr. Sturm if they had been granted a continuance, the defendant stated:

> A.    I told him I needed him to question these witnesses, the alibis that proved my innocence.  And I told him, you know, if he would have been prepared, he would have seen everything that was coming.  We wouldn't be in the situation today because to me the evidence never did match the indictment that the Government put on.  And I put that in my position also that's in exhibits.

> Q.    It is clear from your filings with the court that you are referring to the December 2nd and December 9th telephone calls, is that correct?

> A.    Yes, sir.

> Q.   And can you please explain in greater detail your concern with that as it relates to Mr. Sturm's ineffectiveness?
>
> A.   If he would have had time to prepare, he would have seen that the evidence they presented did not even match the indictment or the charges that I was facing.

(ECF No. 259 at 15).

During the evidentiary hearing, the defendant testified that he was unaware that Mr. Sturm had filed motions on his behalf before the pre-trial motions hearing.  He further testified that he believed that Mr. Sturm argued motions that had been previously filed by his former counsel, Edward Weis.  (*Id.* at 10, 19).  On cross-examination, Assistant United States Attorney Monica D. Coleman introduced two pre-trial motions filed on October 6, 2010 by Mr. Sturm.  (ECF No. 257, Attach. 1 and 2, which were initially filed in the defendant's criminal case as ECF Nos. 74 and 75).  One of the pre-trial motions filed by Mr. Sturm was a Motion to Compel Production of Brady Materials, in which the defendant requested information possessed by the government concerning the defendant's prior service as a confidential informant ("CI").  During the evidentiary hearing, Ms. Coleman asked the defendant how Mr. Sturm would have known about the defendant's prior service as a CI if he had not met with him.  (ECF No. 259 at 22-23).  The defendant responded "I guess he read my discovery or – I, I don't know."  (*Id.* at 23).  Ms. Coleman then clarified that the motion filed by Mr. Sturm was requesting discovery on that issue.  (*Id.*)

Ms. Coleman also drew out the fact that, following jury selection, the District Court adjourned for the day in order to allow Mr. Sturm to meet with the defendant later that night before any evidence was presented.  (*Id.* at 24-27).  The defendant further admitted that Mr. Sturm cross-examined each of the government's witnesses, including about

issues reflecting on their credibility.  (*Id.* at 28).  Ms. Coleman also pointed out that, as reflected in the trial transcript, after he cross-examined each of the government's witnesses, Mr. Sturm consulted with the defendant to determine whether there was anything else the defendant wished for him to cover.  (*Id.* at 27-28).

Although his specific recollection of facts concerning his trial preparation was poor, during the evidentiary hearing, Mr. Sturm testified that it was his standard practice to sit down and go through the entire case file with a client and "to make every effort to meet with my client and be as prepared as possible."  (*Id.* at 38. 48).  Mr. Sturm stated that he believed he gave his entire file to Herb Hively when he took over as sentencing and appellate counsel and, thus, he was unable to review the file to refresh his recollection.  (*Id.* at 36).

Mr. Sturm recalled filing the two pre-trial motions on behalf of the defendant and he further recalled that he discussed with the defendant a plea offer made by the government.  (*Id.* at 37).  However, Mr. Sturm did not recall any specifics about the defendant's request to call certain witnesses and he did not specifically recall attempting to interview those witnesses.  He stated, "It seems to me that at some point I talked to family members of his.  Whether or not that was regarding the case or just, you know, to get something for him or if they maybe contacted me, I don't know."  (*Id.* at 38).

Mr. Sturm further recalled that he met with the defendant at the jail on the night in between the two days of trial.  He recalled that he could not go straight to the jail, but drove back down there that evening and met with him.  (*Id.* at 40).  Mr. Sturm testified that he believed that he was prepared for trial.  (*Id.*)

Mr. Carr questioned Mr. Sturm about his cross-examination of Detective Tom Carper.  The following is an excerpt from that colloquy:

> Q.    During the cross-examination of Detective Carper, who was the first witness called by the Government, Detective Carper repeatedly referred to telephone calls that were made between the CI and allegedly Mr. Hardy with Mr. -- excuse me – with Detective Carper referring to the calls being made to Mr. Hardy without any foundation as to Detective Carper's knowledge of that.  Do you recall that in the trial transcript?
>
> A.    I – no, I don't recall his testimony.

(ECF No. 259 at 41).  Mr. Carr subsequently asked Mr. Sturm about his trial strategy.  Mr. Sturm responded as follows:

> A.    Oh, his defense was that he was not providing the drugs that were, that showed up at trial that the Government ultimately got their hands on and said they came from him as part of an aiding and abetting indictment.  Our position was that they did not.
>
> Q.    And were you aware of any issue concerning the recordings of any of the CI buys?
>
> A.    There were – I believe there were one or two recordings.  There may have been a third recording.  I believe it was him talking to Government – talking to the Government, one of their agents, Agent Negro, I believe.  With one of those recordings, at least, there was either a break in it or some sort of equipment malfunction.  I remember that coming up as an issue.  But with regards to which specific statement that was or recording, I don't recall.  And that's -- I believe one issue that was raised in a pre-trial motion as well.[11]

(*Id.* at 42-43).

Mr. Sturm further testified that he believed that the defendant told him that Mr. Weis had provided him with some discovery, but that the defendant may have lost it in his transfer between facilities.  Thus, Mr. Sturm believed he contacted Ms. Coleman to get another copy of what had already been exchanged and that he provided those materials,

---

[11]   The second pre-trial motion filed by Mr. Sturm was a motion to compel seeking the production of the portion of the defendant's recorded interview with Special Agent Negro that was missing ("the gap") or, in the alternative, a motion *in limine* to preclude the use of the statement at trial.  (ECF No. 75, also admitted at the evidentiary hearing as Defendant's (Government's) Exhibit 1, ECF No. 257, Ex. 1).  Both pre-trial motions were denied by Order entered on October 13, 2010.  (ECF No. 85).

and subsequent discovery that was produced about a week before trial, to the defendant as he received them, either by hand or by mail.  (*Id.* at 43, 49-51).

At the conclusion of the evidence, Mr. Carr again summarized the defendant's ineffective assistance of counsel claims, stating as follows:

> There are a number of things, though, that were testified to here today which I do think are relevant to the Court's consideration of the claim of ineffective assistance of counsel.
>
> The first is the specific testimony by Mr. Hardy regarding the number of times that he met with Mr. Sturm prior to the start of the trial; when it was he actually received the discovery; the lack of a discussion with Mr. Sturm regarding not only the discovery but also the trial strategy; the, the witnesses that he had identified to Mr. Sturm, none of which were called actually at the trial.  There was no case put on on Mr. Hardy's behalf.
>
> And the trial transcript also certainly reflects that while Mr. Sturm did cross-examine the witnesses, that that cross-examination was such that a link between the confidential informant and Mr. Hardy was really not fully addressed.  The credibility was not fully attacked for the purposes of convincing the jury that Mr. Hardy was not involved in these two counts. His testimony was very specific in that regard.
>
> While I understand that some time has passed, while Mr. Sturm can testify as to his standard practice, he actually could not state how many times he met with Mr. Hardy before trial, and whether the information that he did recall learning from Mr. Hardy, whether that occurred prior to the motion hearing, prior to the, or prior to the beginning of trial, or if it was actually during the trial.
>
> It is, it is also the case that Mr. Sturm cannot eliminate or discount the possibility that some of the information was learned from prior counsel and when the discovery was actually provided to Mr. Hardy.
>
> And it also certainly indicates in the transcript with that discussion with the judge that Mr. Hardy certainly believed on the morning of trial that he was not prepared to go to trial, prepared to go to trial and that Mr. Sturm was not prepared to go to trial.
>
> And, again, we have specific testimony that that – from Mr. Hardy that he did, in fact, meet with Mr. Sturm later that night, but only for a half hour to an hour.

(ECF No. 259 at 60-62).

In her concluding remarks, Ms. Coleman restated the *Strickland* standard, and reminded the court that strategic decisions, unless unreasonable, are not to be second-guessed.  (*Id.* at 62-63).  She further summarized the evidence as follows:

> The transcript from the trial which the Court has is clear that Mr. Sturm was prepared for trial.  He told the court so.  He reviewed the discovery.  He was familiar with the Government's case.  And he was able to cross-examine the witnesses in the Government's -- after the Government's case.
>
> He sought each cross-examination and conferred with the defendants for follow-up questions.  He – that is all clearly in the transcript.
>
> Just because six or seven years later that cross-examination may not be the same as what another attorney would do, those are not the kinds of decisions that result in a claim of ineffective assistance of counsel.

(ECF No. 259 at 63).  Ms. Coleman further asserted that, contrary to the defendant's assertions, the evidence demonstrated that Mr. Sturm prepared and filed the pre-trial motions and that there is no reason to believe that Mr. Sturm deviated from his standard practice with respect to preparing for a criminal trial.  Ms. Coleman noted that, although he could not remember specifics, Mr. Sturm testified that he had numerous conversations with the defendant, shared discovery with him as he received it, conferred with him during cross-examination and worked with the defendant on how best to approach and defend against the government's case.  (*Id.* at 63-65).  Accordingly, Ms. Coleman asserted that the defendant cannot meet the first prong of the *Strickland* standard concerning the objective reasonableness of Mr. Sturm's performance.  (*Id.* at 65).

## **ANALYSIS**

### **A.    The defendant's criminal history category claim is untimely, procedurally barred and without merit.**

As discussed above, on July 13, 2015, the defendant filed a Letter-Form Motion to Amend (ECF No. 229).  Pursuant to Rule 15(c) of the Federal Rules of Civil Procedure,

which is applicable in section 2255 proceedings, an amendment is appropriate and timely under the applicable statute of limitations when it relates back to the original pleading.

Prior to 1996, a Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 was not subject to a specific time limitation with respect to filing of the motion. However, in April 1996, Congress enacted the Anti-Terrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), which established a one-year period of limitation governing the filing of motions for collateral relief under 28 U.S.C. § 2255. Because the defendant was convicted after the enactment of this provision, his conviction and sentence are subject to these requirements.

The one-year period runs from the latest of one of four specified events:

(1) the date on which the judgment on conviction becomes final; (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or Laws of the United States is removed if the movant was prevented from making such motion by governmental action; (3) the date on which the right asserted was initially recognized by the Supreme Court if that right has been duly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

Turning first to section 2255(f)(1), the defendant's judgment became final when he failed to file a petition for a writ of certiorari following the denial of his direct appeal. *See Clay v. United States*, 537 U.S. 522, 532 (2003) (federal criminal conviction becomes final for purposes of calculating AEDPA statute of limitations when time expires for filing petition for certiorari contesting appellate court's affirmation of conviction). In this case, the defendant's judgment became final on or about January 13, 2013. Accordingly, the one-year statute of limitations expired on or about January 13, 2014. Therefore, the defendant's Letter-Form Motion to Amend was filed well outside the one-year statute of

limitations under section 2255(f)(1).  Moreover, the defendant's new claim concerning the calculation of his criminal history points does not appear to relate back to any of his other claims raised in his original section 2255 motion so as to satisfy Rule 15(c) of the Federal Rules of Civil Procedure.  Therefore, the proposed amendment is untimely.

Nor does the undersigned believe that the defendant's case meets any of the factors for application of sections 2255(f)(2)-(4).  The defendant, with due diligence, should have been aware of the alleged error in his criminal history category prior to or during his sentencing hearing and should have then raised an objection to such calculation.  At the very least, the defendant should have raised this issue for plain error review during his appeal.  For these same reasons, this claim is now procedurally barred from collateral review.  *See United States v. Frady*, 456 U.S. 152 (1982); *Bousley v. United States*, 523 U.S. 614, 621 (1998).[12]

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the defendant's attempt to amend his section 2255 motion to raise a claim concerning the alleged improper calculation of his criminal history points fails to relate back to his original pleading and is untimely under AEDPA.  The undersigned further proposes that the presiding District Judge **FIND** that this claim is procedurally defaulted and barred from review and, thus, amendment of his section 2255 motion on this basis is inappropriate and futile.

Alternatively, even if this claim were appropriate for review by this court at this procedural stage, it appears to lack merit.  This claim appears to concern paragraph 40 of the defendant's Presentence Investigation Report ("PSR"), which indicates that the

---

[12] *See* additional discussion of procedural default in section B, *infra.*

defendant pled guilty to two misdemeanor possession charges which were contained in the same charging instrument and for which he was sentenced to concurrent 6-month sentences.  The defendant asserts that, pursuant to Section 4A1.2(a)(2) of the United States Sentencing Guidelines, he should have received one criminal history point, instead of two, because these multiple sentences were contained in the same charging instrument and the sentences were imposed on the same day.

However, pursuant to Section 4A1.1(b)(2) of the Guidelines, the defendant was properly assessed <u>two</u> criminal history points for these convictions, which were essentially treated as one sentence of at least 60 days that was not counted under section 4A1.1(a) of the Guidelines.  Accordingly, if the presiding District Judge believes that a ruling on the merits of this claim is required, the undersigned proposes that the presiding District Judge **FIND** that the calculation of the defendant's criminal history category was correct, and the defendant's claim for relief on that basis lacks merit.

To the extent that the defendant also addressed this issue in the document entitled "Judicial Notice" in ECF No. 235, his request in that document simply appears to be asking the court to consider his argument and take corrective action.  Nevertheless, if the defendant is requesting that the court take judicial notice of his alleged criminal history error (which the court finds not to be erroneous), pursuant to Rule 201 of the Federal Rules of Evidence, the undersigned proposes that the presiding District Judge **FIND** that the defendant's "Judicial Notice" document (ECF No. 235) does not contain facts that "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned" and, thus, the court may not appropriately take judicial notice thereof.  Consequently, it is respectfully **RECOMMENDED** that the presiding District Judge **DECLINE** to take judicial notice as requested by the defendant.

**B.    The defendant's claims of prosecutorial misconduct, constructive amendment of the indictment and failure to disclose *Brady* materials were addressed on appeal and are barred from collateral review.**

It is clear from a review of the defendant's *pro se* supplemental petition filed in his direct appeal (ECF No. 244, Attach. 1), and the Fourth Circuit's decision affirming his convictions, *United States v. Hardy,* 498 F. App'x 191, 2012 WL 4857479 *2 (4th Cir. Oct. 15, 2012), that the Fourth Circuit considered these claims on the merits and found no reversible error.  Accordingly, as argued by the United States, the defendant is barred from re-asserting these claims in this collateral proceeding because they were presented and denied by the Fourth Circuit on appeal.  *See Boekenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976).

However, to the extent that any of these claims are determined to have not been addressed on appeal, the government's Response further notes that a defendant's failure to pursue a claim through the normal appellate process has significant impact upon his ability to later raise that claim in a section 2255 motion.  The government's brief contends that non-constitutional claims that could have been raised on appeal, but were not, are conclusively waived.  *See Stone v. Powell*, 428 U.S. 465, 477 n.10 (1976); *United States v. Emmanuel*, 869 F.2d 795 (4th Cir. 1989).  Alternatively, the government's brief further contends that, to the extent that any of these claims can be construed as constitutional claims that were not specifically raised in the defendant's direct appeal, the failure to raise them on appeal is a procedural default that can only be overcome by the showing of cause and prejudice or actual innocence in order to pursue such claims in a section 2255 motion. *See United States v. Frady*, 456 U.S. 152 (1982).  The government asserts, and the undersigned agrees, that the defendant has not demonstrated such cause and prejudice

or actual innocence, "especially in light of his admission to the acts for which he was convicted during his revocation hearing." (ECF No. 185 at 9 and Ex. 4 at 6-7).[13] Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff is procedurally barred from pursuing collateral relief on these claims.

### C.    The defendant's ineffective assistance of counsel claim lacks merit.

The Supreme Court addressed the right to effective assistance of counsel as guaranteed by the Sixth Amendment in *Strickland v. Washington*, 466 U.S. 668 (1984), in which the Court adopted a two-pronged test. The first prong is competence; the defendant must show that the representation fell below an objective standard of reasonableness. *Id.*, at 687-91. There is a strong presumption that the conduct of counsel was in the wide range of what is considered reasonable professional assistance, and a reviewing court must be highly deferential in scrutinizing the performance of counsel. *Id.* at 688-89.

> [In order to meet the first prong, the defendant] must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Id.* at 690.

The second prong is prejudice; "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient

---

[13] As noted previously herein, during his supervised release revocation hearing, the defendant admitted to the first violation which arose out of his alleged participation in or aiding and abetting of the December 2, 2009 cocaine base sale, which also comprised Count One of his Superseding Indictment.

to undermine confidence in the outcome." *Id.* at 694.  The court may determine the prejudice prong prior to considering the competency prong if it is easier to dispose of the claim on the ground of lack of prejudice.  *Id.* at 697.  As noted by the government, "an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if that error had no effect on the judgment." *Id.* at 691.  (ECF No. 185 at 11).

The defendant's ineffective assistance claims center around Mr. Sturm's alleged lack of preparation for trial, and the defendant's contention that, as a result of being ill-prepared, Mr. Sturm did not effectively cross-examine the government's witnesses and did not present any evidence on behalf of the defense.  He claims that Mr. Sturm failed to meet with him in order to sufficiently plan a defense strategy.  His section 2255 motion states [spelling and punctuation errors corrected by the undersigned]:

> We asked the courts for continuance and it was denied [citation omitted] however not having time to go over any evidence on my behalf, and point out the inconsistency in the statements.  It greatly reduced me to prepare myself to refute with the government's case, for example CI stated me and Pedro Munos were business partners, and that he received this information from Randy and Michael Schoolcraft [citations omitted], then later in his testimony, Witt says I told him Munos and I were partners [citation omitted].  Then Witt again changes his testimony and states I didn't tell him that [citation omitted], not was it only [not only was it?] hearsay Mr. Sturm never objected to this madness.  In a similar incident to Sturm's ineffectiveness, the statement was made that I dropped Munos off in the Dec. 2 deal CI Witt states a person named Sammy Joe Fragle [Fragale?] dropped Pedro off that day.  I held those statements and Mr. Sturm failed to impeach witness testimony [citation omitted].

(ECF No. 178 at 9-10).

The government's Response contends that the defendant's assertions that Mr. Sturm failed to impeach the CI's testimony or point out inaccuracies in his testimony is wholly unsupported by the record.  The Response further asserts:

A review of counsel's cross-examination of the CI clearly shows that counsel addressed both of these topics during his cross-examination. *See* Exhibit 2, Trial Transcript at 44-52. Contrary to defendant's unfounded assertion otherwise, the CI testified that he was unaware of how Mr. Munos arrived at the December 2, 2009 controlled buy. *See* Exhibit 2, Trial Transcript at 50. Defense counsel further cross-examined the CI with regard to his knowledge about the defendant relationship with Pedro Munos, who is also known as "Pablo," and the fact that he was under the influence of crack cocaine at the time he claimed to have heard the statement that defendant and Munos were partners. *See* Exhibit 2, Trial Transcript at 48-49. It is clear that defense counsel, in his considered judgment, elicited unfavorable facts from both Mr. Munos and the CI, and put forward a defense that Mr. Munos and Mr. Witt were the only two people present during each of the controlled buys and that Mr. Munos had a separate source of supply for cocaine base that he met in the same area as the December 2, 2009 controlled buy. *See* Exhibit 2, Trial Transcript at 44-54, 66-71.

(ECF No. 185 at 11-12). Accordingly, the government asserts that the defendant has not shown that there is a reasonable probability that the verdict would have been different if Mr. Sturm had conducted cross-examination as suggested by the defendant. (*Id.* at 12). Therefore, the government contends that the defendant cannot demonstrate the requisite prejudice to establish a Sixth Amendment violation. (*Id.*)

A review of the defendant's criminal docket sheet reveals that a CJA 20 Form appointing Mr. Sturm to represent the defendant was entered on July 27, 2010 (but the appointment was ordered to be effective *nunc pro tunc* to July 23, 2010). (CJA 20 Form, ECF No. 66). The criminal docket sheet further reveals that, on August 20, 2010, Mr. Sturm filed a Motion to Continue Pre-trial Hearing Date and to Continue Trial (ECF No. 67). That motion states in pertinent part:

Undersigned counsel has received Mr. Weis' file and spoken with the defendant and has concluded that the case will most certainly proceed to trial, a trial which in counsel's opinion will require extensive investigation and preparation.

(ECF No. 67 at 1) [Emphasis added]. Thus, according to this motion, Mr. Sturm possessed the defendant's case file and had spoken with the defendant at least once prior to filing

the two pre-trial motions on October 6, 2010 and prior to the motions hearing which was held on October 13, 2010.  This record is more accurate than any present recollection of the defendant or Mr. Sturm.

Furthermore, a review of the trial transcript demonstrates that Mr. Sturm cross-examined Detective Tom Carper about the fact that, at the time of the controlled buys, he could only hear Witt's side of the telephone calls, and that, with regard to the recordings of the calls, he is basing his information that the defendant was on the other end of the phone calls on what Witt told him.  (*See* ECF No. 171 at 19-25).  Furthermore, Mr. Sturm vigorously cross-examined Jeff Witt and Pedro Munos and called into question issues about their credibility, particularly the fact that Munos did not implicate the defendant in these drug transactions until that fact was able to benefit Munos at his sentencing through his cooperation with the government, and that he had other suppliers of drugs on the west side of Charleston.  (*See* ECF No. 171 at 68-70).

In applying the *Strickland* standard with respect to the defendant's claims of ineffective assistance of counsel, even if the court could find that Mr. Sturm's performance fell below an objective standard of reasonableness, the defendant has not demonstrated any evidence to support a finding that he was actually prejudiced thereby.  The defendant has not offered any specific evidence of the proposed testimony of the witnesses that Mr. Sturm failed to call.  He simply speculates that such unspecified testimony would have supported an alibi defense.  Nor has the defendant offered in evidence the alleged pay stubs that he asserts would have demonstrated that the money seized from his residence came from a legitimate source.  Moreover, to the extent that the defendant claims that Mr. Sturm's cross-examination of the government's witnesses was ineffective, he has not sufficiently demonstrated what evidence should have been brought out on such cross-

examination that would have altered the jury's verdict.

In short, the defendant has not demonstrated any evidence to support a finding that, but for Mr. Sturm's conduct, he would not have been convicted of aiding and abetting the distribution of cocaine base as alleged in his Superseding Indictment. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the defendant has not demonstrated prejudice sufficient to establish a Sixth Amendment violation as outlined in *Strickland* and, thus, his ineffective assistance of counsel claim must fail.

## <u>RECOMMENDATION</u>

For the foregoing reasons, it is respectfully **RECOMMENDED** that the presiding District Judge **DENY** the defendant's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence (ECF No. 178). It is further respectfully **RECOMMENDED** that the presiding District Judge **DENY** the defendant's Motion for Judgment (ECF No. 220) and his Letter-Form Motion to Amend (ECF No. 229) and dismiss this civil action from the docket of the court. It is further respectfully **RECOMMENDED** that the presiding District Judge decline to take Judicial Notice as addressed in ECF Nos. 186, 235 and 237, as the matters addressed therein are not appropriate for judicial notice under Rule 201 of the Federal Rules of Evidence.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), Rule 8(b) of the Rules Governing Proceedings in the United States District Courts Under Section 2255 of Title 28, United States Code, and Rule 45(c) of the Federal Rules of Criminal Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service), from the date of filing this Proposed

Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985*); United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties and Judge Johnston.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy of the same to Movant, and to transmit it to counsel of record.

August 3, 2o16

Dwane L. Tinsley
United States Magistrate Judge